Our first case this morning is Illinois and Liberty PAC v. Madigan, Case No. 16-3585. Mr. is it Hubert? May it please the Court. When a plaintiff challenges campaign contribution limits under the First Amendment, the government bears the burden to show, with evidence, that the limits are narrowly tailored to serve the government's interest in preventing actual or apparent quid pro quo corruption. In this case, the plaintiffs have alleged that Illinois' campaign contribution limits are not narrowly tailored to prevent corruption for several reasons. One, the Act limits individuals to giving contributions that are half the amounts that corporations, unions, and other associations can give. But those kinds of restrictions have long been upheld. Those kind in the sense of it is true that the state can limit contributions by individuals and it can limit contributions by those other groups. But different caps have been approved. The Supreme Court has said that you can limit different types of entities differently based on the differences between those entities. But nonetheless, it's up to the state to justify the specific choice that it has made in every case. And then the second reason the plaintiffs have argued that this scheme is not narrowly tailored to prevent corruption is because the statute removes all limits on contributions to candidates in a race where independent expenditures or a candidate's self-financing has reached a certain threshold amount. Third, the statute allows political parties to give unlimited amounts to candidates in a general election and much larger amounts than others in a primary election. And fourth, the statute similarly allows legislative caucus committees controlled by the state's legislative leaders to give candidates unlimited amounts in general elections and much larger amounts than others in primary elections, even though their contributions would seem to entail a threat of corruption that is similar to the threat of corruption posed by contributions given by PACs. Now, with respect to all but one of these issues, the district court decided the case on the pleadings, am I correct, or on the complaint? That's correct. The district court disposed of those first three arguments as a matter of law in partially granting the state's motion to dismiss. So don't we have a procedural issue as a threshold matter as to whether that was correct? Well, of course, we would argue that the dismissal of those arguments was incorrect, that the court couldn't dispose of those arguments as a matter of law when the state had done nothing to meet its burden at that stage. And so we could give you relief by simply remanding those to the district court and saying that he prematurely got rid of those on the pleadings. Yes, Your Honor, and that's precisely what we're asking for with respect to those three facets of plaintiff's claim. Those three facets of the claim should be remanded to the district court so that the district court in the first instance can apply the appropriate level of scrutiny. What was the point of distinction in the district court's mind between those three and the one on which he went to trial? The district court considered the first three facets of plaintiff's claim to be controlled by Supreme Court precedent, and it considered the fourth question to be more debatable. And so it allowed the fourth question to proceed first to motions for summary judgment and then to a trial.  Well, in upholding the discriminatory limits favoring corporations and unions over individuals, the court said that Buckley controlled. Buckley upheld a $1,000 limit for individuals' contributions and a $5,000 limit for contributions by PACs. Yes. And the court took that to mean that the Supreme Court had categorically approved higher contribution limits for entities than for individuals. So the court thought Buckley controlled the comparative question as well as the limits with respect to each group. Is that right? That's right, but Buckley doesn't control on that point. One reason why is because Buckley didn't consider the disparity between the $1,000 limit and the $5,000 limit for PACs. That wasn't an issue in the case. And another more important reason why Buckley doesn't control is because the higher limit in Buckley was a limit placed on PACs, not all entities. And, in fact, the federal law at issue in Buckley completely banned contributions by corporations and unions, and it limited contributions by other types of groups to the same $1,000 limit. Well, right. That's just a distinction, though, between different forms of organizational associations. The legal principle is that individual contributions can be subjected to a lower cap than those imposed on organizational associations that are banned from receiving contributions. Here there's no such ban, obviously, based on Citizens United. So the basic principle of treating associations of all type, whether they're corporations or unions or other forms of associations, is permissible categorically. Well, there's a reason why Buckley said it was okay to treat PACs better. It did consider the difference between PACs and other types of entities, and it said you can subject PACs to a higher limit because they're subject to special rules that involve reporting of who gives to those PACs and rules that ensure that people can't use PACs to circumvent the limits imposed on individuals and other organizations. So PACs are a special case where there's a specific justification the court recognized for giving them a higher limit. Now, the state, a government might theoretically be able to justify a higher limit for corporations than for individuals, but the burden is on it to do so, and here the state simply hasn't met that burden. Has any of the other courts of appeals articulated the principle my sister just stated? Stating categorically that you can always impose higher limits on entities than on individuals? I'm not aware of any decision categorically. Or that all entities ought to be considered the same for purposes of comparison with individuals. No, and again, the Supreme Court has repeatedly recognized that different types of entities might warrant different types of treatment. Well, didn't the district court kind of implicitly recognize that by going to trial on one of the issues? It implicitly did argue, yeah, that that could be the case with respect to the legislative caucus committees,  but there's no case saying that it's okay to subject corporations and unions to a higher limit than individuals. In fact, the federal government and many states ban corporate and union contributions entirely, and no state except Illinois allows a corporation or a union to give more to a candidate than an individual can give. So this is extraordinary, and it calls for some explanation, and the state has never even explained it. Never mind evidence. They've never even explained why the state believes it's appropriate to restrict individuals more. And so because the state has never done the first thing to satisfy its burden in this respect, the district court erred in dismissing this facet of claims. Well, is there any case in the United States that's been like this? There are cases that have dealt with the comparison, am I correct? The case in the 10th Circuit, the 8th Circuit, I think it is, right? Oh, that's right. There is an 8th Circuit decision that says that small donor packs and large donor packs can't be subject to different contribution limits. And then there was an Eastern District of Kentucky case recently that said, if I recall correctly, that corporations and LLCs and similar organizations, if you impose different limits on them, that should be subject to strict scrutiny. Were any of those cases decided on the pleadings? No, not that I'm aware of. They all went to at least summary judgment? That's right, and that only makes sense because the burden is on the state to justify the limits that it has imposed here. And typically, of course, you can't meet that burden simply on the pleadings unless plaintiffs have made unusual allegations that would show that the limits are justified. But that's not what happened here. The state and the district court just pointed to Buckley in the instance of the first argument and said that controlled, and that was the end of the analysis. The court never engaged in the kind of rigorous scrutiny that the Supreme Court has said is appropriate, most recently in the McCutcheon case. In Buckley, did the court treat the comparative issue as one of adjudicative facts that really has to be tried, or did they look at it more as a premise fact, a background fact that the judge, in effect, can take notice of? I don't know. I don't recall that Buckley specifically said anything about this specifically, but there was a developed record in Buckley, which the court could look to, that government had presented explanations for why it had done what it did, and I think would have substantiated that in some way. And in any event, decisions since Buckley, such as the Nixon case, say that the government has to come forward with some kind of evidence to justify what it's done. It can't just assert an interest in preventing corruption. Evidence or a rationale? Well, certainly a rationale, and at least some modicum of evidence. The court said in Nixon that the amount of evidence the government has to present might vary up and down, depending on how novel the scheme in question is. But Nixon makes clear that the government always has to present something specific to the situation in, like, corruption issues in that state. And then with respect to Plaintiff's next argument concerning the limit-lifting provisions, the statute here takes all contribution limits away when independent expenditures or a candidate's self-financing reaches a certain amount. And the district court rejected this argument out of hand, saying that it was controlled by Davis versus FEC, because the Supreme Court said in that case that a plaintiff can't challenge contribution limits for being too high, and the court believed that was essentially what plaintiffs are doing here. But plaintiffs aren't challenging limits for being too high. Plaintiffs are challenging the imposition of limits on them when independent expenditures or a candidate's self-financing hasn't reached the threshold amount. Plaintiffs' ability to exercise their First Amendment rights, the extent to which they can exercise their rights, is controlled by an arbitrary factor that's outside their control, whether other people are self-financing or engaging in independent expenditures. And, of course, whether people are doing those things has nothing to do with the state's interest in preventing corruption. It would take a fairly bold district judge to disagree with the language in Davis, wouldn't it? Well, if you take the language of Davis on its face, it suggests that you can't. We usually tend to do that when the Supreme Court tells us what would happen in the next case. Well, the Supreme Court didn't talk about an under-inclusiveness challenge. It says you can't challenge limits for being too high, but that's not what plaintiffs are doing here. Plaintiffs are arguing that because the state is willing to give up these limits completely in response to something that has nothing to do with its interest in preventing corruption, then that undermines the state's argument that the scheme that it's enacted is necessary to prevent corruption. And, in fact, in the Bennett case, which came after Davis, the court emphasized that the purpose the government is trying to serve with this limit-lifting provision, which is leveling the electoral playing field, isn't a legitimate government objective at all. Not only is it not a compelling government interest, it's not a legitimate government interest. And it's undisputed that that's what the government is trying to do with this limit-lifting provision. It's in the legislative history. The state hasn't denied it here. And Bennett says specifically that when the state is faced with a choice between preventing corruption or equalizing speech, and it chooses equalizing speech, that casts a significant doubt on whether the scheme in question is actually designed to prevent corruption. And, of course, that doubt is what a plaintiff needs to show in an under-inclusiveness challenge. The state hasn't explained why it suddenly doesn't care about corruption at all when independent expenditures or self-financing reaches a certain amount. And it has to explain that. It doesn't care at all? Yes, because it takes away all the contribution limits. And it's all part of a much larger scheme that involves reporting, correct? That's true. You can't just isolate individual provisions like that. There are a lot of different moving parts here, right? Well, if the state's going to justify the limits, the contribution amount limits that it has imposed at all, it has to do that in terms of preventing corruption. It has to say why we think that letting an individual give more than $5,000 presents an intolerable threat of corruption that we need to prevent. And that has to be the justification for the $5,000 limit on individuals. And yet, when these independent expenditures come in, the state suddenly doesn't care about contributions above $5,000. And that doesn't make any sense. If the state thinks it in one circumstance, it should still think it in the other. And if it doesn't, that at least calls for some explanation. And the state hasn't provided that explanation. And whatever explanation they give has to be stated in terms of the state's interest in preventing corruption. It can't be stated in terms of leveling the state's interest in leveling the playing field because the Supreme Court has made clear that is not a legitimate interest. Now, of course, the merits of plaintiff's claim on this theory aren't before the court at this time. All that's before the court at this time is whether the district court erred in dismissing this argument as a matter of law when the state had presented no evidence to satisfy its burden to show that the limits are narrowly tailored despite this provision. And the state didn't meet that burden. And so we asked this court to reverse this aspect of the district court's dismissal. Next, the district court erred in dismissing the facet of plaintiff's First Amendment claim based on the Act's treatment of political parties. Again, the Act allows political parties to give unlimited amounts to the candidates they support in a general election and much larger amounts than others in a primary election. And here again, the state didn't do anything to satisfy its burden. All the state did was point to the Supreme Court's decisions in Colorado 2 and McConnell v. FEC and treated those as though they were controlling. And then the district court treated them as controlling as well. But those cases don't control here. In Colorado 2, the Supreme Court said that political party contributions to candidates can pose a threat of quid pro quo corruption. And the district court pointed out that the limits on parties in that case were much higher than the limits on other donors. But the disparity was not at issue in that case. The only question in Colorado 2 was whether the government could limit its political party's contributions at all. And the Supreme Court said yes, because those contributions could harm the government's interest in preventing corruption. The district court also cited the statement in McConnell that the government can treat PACs and parties differently based on the real world differences between them. But again, that's not categorical approval of any scheme that treats PACs and parties differently. What that means is the government has to justify the different limits that it's imposed based on the real world differences between PACs and parties. And the government never did that here. All it did was point to these other cases and acted like that should be enough. But it's not enough given the government's burden and the rigorous standard that the Supreme Court requires courts to apply to challenges to campaign contribution limits. Finally, the district court also erred in rejecting plaintiffs' fourth argument that the act's treatment of legislative caucus committees is improper. Again, legislative caucus committees are committees that are controlled. There's one controlled by each of the four legislative leaders in the Illinois General Assembly, the Speaker of the House, the Senate President, the minority leaders. They each have one of these committees where they can give unlimited amounts to the candidates they support in a general election and much larger amounts than everybody else except other party committees in a primary election. And the plaintiffs argue that this isn't justified because the legislative leader is certainly in a position to make quid pro quo demands on someone who's getting money from the leader. The leader is limited when he or she gives money through a candidate committee or through a PAC because the presumption is that their contributions above a certain amount could be corrupting. And yet they're allowed to use their legislative caucus committees to circumvent those limits on them entirely. And evidence in the record shows that they have done exactly that. They've given money through their candidate committee, then give money to their legislative caucus committee to give much more than they otherwise could give. And the district court held a trial on this facet of plaintiffs' claim. And at that trial, plaintiffs presented testimony from an expert witness who testified that, in fact, legislative caucus committees are similar to PACs in their contributions' potential to corrupt. And the state, on the other hand, didn't present any evidence to contradict that. The state tried to poke holes in the expert witness' testimony, but it never presented anything to affirmatively meet its burden. And so for that reason alone, the plaintiffs should have prevailed after trial because the burden was on the state, and the state didn't do anything to meet it. Of course, the plaintiffs also argue that the district court erred in not crediting plaintiffs' experts' testimony, but the plaintiffs are content to rest on the argument in their briefs on that point unless the court has questions, because what should control here is that the state simply did nothing to meet its burden. And it's interesting that in the district court's opinion after trial, it says, yes, plaintiffs are correct that the burden is on defendants here. But then after that, it says nothing about how the state met its burden. It doesn't say the state met its burden by showing this or that. The district court just goes on to poke what it believes are holes in the plaintiff's expert testimony. But that's not enough. So to conclude, I want to emphasize that the burden in this case was on the state. The Supreme Court has made that abundantly clear, most recently in the McCutcheon case, that the standard in these cases is a rigorous one, and the burden is on the state to justify what it's done. And it's especially important for the state to do so in a situation where it has treated some participants in the political process more favorably than others, because obviously that gives rise to the possibility that the government could be manipulating who succeeds and who fails in an election, depending on where they draw their support from. And of course, the government, the First Amendment doesn't allow the government to be in that business at all, and courts should guard against that. And so for that reason, we ask the court to reverse the dismissal of the first three facets of their claim, remand that so the district court can apply the appropriate scrutiny in the first instance. And we also ask the court to reverse the judgment against the plaintiffs on the final facet of their claim. Thank you. Thank you. Ms. Welsh. Good morning, Your Honor. As may it please the court, I'm Mary Welsh. I'm here on behalf of the Illinois State Board of Elections members and also Attorney General Madigan. Your Honor, plaintiff's argument, as he said, turns the First Amendment on its head. They want us to justify having no limits, and again the Supreme Court has said very clearly that there is no First Amendment problem with having limits that are too high or even unlimited contributions. And in fact, the district court was correct in finding first that to have no limit on self-funders or their opponents is really mandated by Davis. What Davis and other Supreme Court cases have indicated is that you can't limit a self-funder, you can't limit a candidate to self-fund, and you can't have asymmetrical, this is what Davis stands for, you can't have asymmetrical limits. So once you have to allow unlimited funding for the self-funded candidate and you have to have limits, you can't have limits rather, asymmetrically, then you must do what Illinois has done, which is to have no limits, regardless of limits on other individuals or groups or PACs or so on. Illinois had to do this. Illinois must allow self-funders to have unlimited contributions as well as their opponents. So that is why we didn't have to make affirmative empirical evidence presentation. This is as a matter of law, Illinois not only is permitted to, but really is required to by Supreme Court case law to have the unlimited contributions for self-funded candidates regardless of what it does for others, the limits on others. And again, the Supreme Court says the state only has to justify its limits, and it doesn't have to justify having no limits. Again, this is the same thing with parties. Parties, the Supreme Court has indicated, or at least six justices, well, five I guess now on the Supreme Court, now it's back to six, have indicated that parties' contributions can't be limited either. It hasn't held this. The case hasn't come up to this. But six justices will agree that there cannot be limits. We've been told to not engage in that head counting, though, right? I'm sorry? We've been told explicitly not to engage in that sort of head counting. Oh, the head counting? Yeah, we've been told it's forbidden to the courts of appeals. Right. You're not supposed to predict, right? Although you are supposed to learn, I think, from the Supreme Court's reasoning, from the justices' reasoning, that, again, there's an identity of interest present for parties and their candidates that is not present for individuals and their candidates. And that's why this over-inclusiveness argument or under-inclusiveness argument really doesn't work because under-inclusiveness applies only when you have comparable entities, individuals to individuals, corporation to corporation, pack to pack. It doesn't apply when you have an individual and a pack versus a political party or, for that matter, a self-funder because they're different animals. This is like comparing apples and oranges. You can't compare, in an under-inclusiveness way, these fundamental differences between a party and an individual or a pack and a self-funder and an individual or a pack. They're not comparable. And under-inclusiveness is the idea behind it is like equal protection. You can only complain about discrimination when it's discrimination among similarly situated plaintiffs. And here you just don't have that. You just don't have that in this scheme, which, as the Court indicated, has lots of moving parts. Everybody gets different treatment. Everybody gets different treatment in contributions and disclosure and so on. And this scheme, Illinois scheme, also is very similar to the federal scheme. And, in fact, the limits in Illinois are higher than the federal scheme. So under plaintiffs, and again, the First Amendment prohibits restricting without a not with only a close, you know, prohibits restricting speech and contributions are only sort of minor speech. Buckley has made this clear. The Supreme Court has said that restrictions on contributions are fundamentally different from restrictions on expenditures. And so the rule for limitations on contributions is much more lenient than the rule on limitations on expenditures. So, again, the Supreme Court and counsel mentioned this. The quantum of empirical evidence that a government has to present to support their restrictions varies with plausibility and novelty. These limits are not novel. These limits are, in fact, higher than Buckley. They were in Buckley. It's only when a restriction on contributions is like the $400, I think it is for Alaska, or $200. You know, when they're really so low that you can't, that a candidate is impaired in the ability to advocate for electoral success. And so here the plaintiffs are not arguing this. The plaintiffs don't say that there's, I don't think they're saying theirs is too low. They cannot say that the restrictions on other people are too high. Right. It's not a randle kind of a claim. It's, as I understand it, a claim about the difference in treatment between different classes of contributors and the preferential treatment for parties and legislative caucus committees, in addition to the waiver provision, the lifting of the caps for self-funded or special interest funded candidates. Right. But it's not, I mean, lifting the caps is, again, putting the First Amendment on its head. We don't have to justify no caps. We have to justify restrictions. Right, there's no discrimination within classes of contributors going on in the waiver provision. That waives contribution limits for all contributors if there's a self-funded candidate above a certain amount or a candidate that gets special interest funding above a certain amount, as I understand the code. Is that? I think that's correct, yes, as I understand your question, right. So, again, the only difference, the only real difference that plaintiffs can complain about is that they're being treated differently. The individuals are being treated differently from corporations. Interestingly, they don't complain that individuals are being treated differently from PACs because one of them is, in fact, a PAC, and they're not complaining about the difference between the two plaintiffs. What's the disclosure regime for these different classes of contributors? Candidates have to disclose everything. I'm sorry? Candidates have to disclose everything. Have to disclose everything, pretty much, right. And I think it depends on the sort of, I haven't done a disclosure case in a long time, but as I recall it, it has to do with the amount of the contribution itself, it has to do with the source of the contribution, and it also has to do with the nature of the, whether it's an issue of, you know, whether it's an issue, independent expenditure super PAC, or whether it's a normal PAC, you know, a non-super PAC, and so on. So they really vary depending on, right. But, again, you know, and Illinois doesn't make differences, you know, between corporations and unions, doesn't make differences among PACs. It really has a very streamlined, you know, unlike some other states, it has a very streamlined scheme of regulatory restrictions on corporations. And, again, it restricts only individuals, entities, union, corporations, and PACs. So, and, you know, it does put a small restriction on parties in certain circumstances. So, again, we, the government plaintiff reiterated again and again that the department, sorry, that the state had a burden of presenting affirmative empirical evidence. But, again, when you have a not novel restriction or a not novel no restriction, and when you have a plausible reason, which is corruption, I mean, surely it cannot be questioned that Illinois has a significant interest in ending corruption in politics, or at the very least its appearance. It cannot be questioned, I would think, almost a matter of law. So then the question really, I think the important question that plaintiffs raised here, and this is why the district court had it, decided that it needed to have a trial on this question, was whether a political, a caucus party, or, sorry, a caucus committee is sufficiently similar to a party to have the same unlimited contributions that a party has, that the party, again, the Supreme Court, just to sum up with regard to the dismissal claims, the state didn't have to present evidence, and affirmative evidence, on the dismissed claims, that is to say the distinction between individuals and corporations, the distinction between plaintiffs and parties, the distinction between plaintiffs and self-funders, because these are not novel, the anti-corruption purpose of the restrictions is exceptionally plausible, and so for the restrictions, and so they could be dismissed as a matter of law without any evidentiary hearing. But the district court found that one of plaintiff's claims, it's more recent claims, and this is why, just to sum up for the last, this is why I think the court found in Illinois Liberty PAC 1, that plaintiffs were unlikely to prevail on the merits, because in the preliminary injunction appeal, when this court summarily affirmed, because really these restrictions on the plaintiffs, and the lack of restrictions on the two other groups, and the slightly higher restriction on the other group, really are not a First Amendment violation as a matter of law, and didn't require an evidentiary hearing. The one question that did require the evidentiary hearing, that the district court found, was the treating caucuses like a political party. Was the risk of corruption, which is in effect very low, as the Supreme Court justices have indicated. For parties. I'm sorry? For parties. There isn't any precedent on point about legislative caucus committees that are controlled by party leadership in the legislature. Right. So the question was, should they be treated like parties, or should they not? Is there enough, is the risk of corruption sufficient, or the lack of risk of corruption, for a caucus committee similar to that of a party, or similar to that of a PAC? Right. And the expert for the plaintiffs testified to what is fairly self-evident to any political observer, which is that legislative caucus committees stand in a different stead than political parties in terms of what they seek to accomplish with contributions. A political party wants to increase its representation in the State House. The leaders' caucus committee wants to increase the number of compliant legislators who will do his bidding. Well, that's, I mean, but I think every party wants to have a cohesive unit in its legislature. It wants parties to agree. I mean, we see this in Congress now, obviously. As yesterday demonstrates. I think every day is demonstrating this. Right, that's why I say it's self-evident that the caucus committees and the legislative leadership stands in a different stead than does the larger, the party writ large. They have an additional interest, that's true. I mean, this is what Dr. Osborne said, that one of the things he said was that caucuses have a different, have a sort of leadership interest in addition to the party interest. But in fact, the plaintiff's own testimony, excuse me, Senator McCarty's own testimony said, yes, I get money, we all get money from the caucus, but it doesn't affect our vote. So he was under oath, this is all I can say. That's just implausible on its face. But I think that, and again, also Dr. Osborne admitted that there are many, many, many other sources of contribution. That individual legislators get. So they don't really, you know, there's no dependence on the caucus. There might be dependence on the party, of course, but again, there's no risk of corruption there. And similarly, and there's no, and I'm sorry, Dr. Osborne also said that in fact, when you looked at the data, Dr. Osborne talked about generalizations in his initial opinion, but every time he was asked about, does the data, does the data support your generalization, he pretty much had to say no. He, for example, he, or his data wasn't big enough. For example, with regard to this, this question, he only examined two leadership committees, only the majority committees, and one of the two of them didn't, the data didn't support his generalization. I mean, this was the problem with Dr. Osborne's testimony. He testified about many generalizations, which seemed self-evident, and yet when he was asked, do the data support it, are the donor base, for example, are the donor bases different between a caucus and a party, and he had to say no. So every time, pretty much, and the district court decision pointed this out, and this is why the district court decision said the defendants met their burden, because every time Dr. Osborne was asked, do the data support your generalization, he had to say no, or he had to say, well, only a little bit, or maybe half and half, and that's the problem with this expert testimony, is that you have to, and the whole idea of having expert testimony is that it brings information to the court, to the fact finder, that the fact finder wouldn't know, but also the fact the expert has to justify, Dr. Osborne here, his opinion with data. He can't just give generalizations. He has to apply the generalizations to the data, and every time he did that, it didn't work. Doesn't it shift the burden? It's the government's burden, right? Right. To prove that the interest and ability to obtain quid pro quos is materially the same for a political party writ large as it is for a legislative caucus committee. Right. Well, I think it's two sides of the same coin. Either it's the same or it's different, right? Right. Your position is it's the same, so we can treat them the same. Correct. Correct. That's the government's argument. Right. I'm sorry? And the plaintiffs say no, legislative caucus committees are really more akin to special interest PACs. Right. In the potential for quid pro quo corruption. Right. Exactly. It's correct, isn't it, though, that legislative caucus committees are in control of the caucus as a whole rather than the leader. Leaders can be replaced, right? Right. They lose the confidence of their members. Yes, of course. Right. Exactly. There are many ways to deal with leadership problems. And, in addition, I'd like to point out that caucus committees How long has that happened in Illinois, or how often has that happened in Illinois? Well, in the Republican Party, I think it happens quite often. In the majority Democrat Party. Not that often. Not for decades and decades. Right. This is true. Although, yes. But I'd also like to point out that to call them leadership committees is not entirely accurate because, in fact, any five senators and any ten representatives can form And how often does that happen? Does the evidence tell us? I believe there are six committees, and there are only four leaders, right? So apparently there are two others. I'm not sure which chamber they're in. But, yes, it does happen. And so this is why we The historical evidence, and maybe there isn't a record on this, this is just anecdotal from observing Illinois politics, is that the caucus operates in lockstep with the leaders. Right. Yes, yes. I think that's probably true. But, again, here, what the state did was show, through Dr. Osborne, not through our own witness, but there's no duty to present affirmative evidence Right. that we showed through Dr. Osborne's testimony. Again, he had three reasons for saying there was a greater risk of corruption for the caucus committees versus a party committee. And each of those three reasons, structure, donor base, contribution strategy, each of those three didn't pan out. I mean, he had to admit he was wrong. I mean, in effect, he was wrong on each of those grounds. And, again, the testimony in the record from the state senator, the plaintiff, was that, in fact, these contributions had no influence on any voting. Again, corruption is about either the idea Corruption is defined in this context as either access or influence. You pay money, you get a vote. We showed, in fact, that there was no vote-for-money payment from a caucus. So that completely undermined Dr. Osborne's testimony. And, in fact, it's hard to prove a negative, and that was how we had to do it, was to prove this negative. There is no risk, just as there's no risk for political parties. So, again, just to recap, unless the court has questions, the district court found correctly as a matter of law that the distinctions between unlimited contributions from parties, unlimited contributions to self-funders and their opponents were, as a matter of law, not First Amendment under-inclusiveness problems. And the district court also correctly found that under Buckley and every other case that has upheld every contribution limit for individuals, for corporations, for PACs, that those limitations are, in effect, not violative of the First Amendment. And, lastly, the district court committed no clear error in finding that caucus committees are sufficiently similar to parties in the lack of risk of corruption that they can be treated as parties under the First Amendment. We ask that you affirm. Thank you. Thank you. Mr. Hubert, you've got four minutes left. Thank you. If the state believes it has a good reason for restricting corporations and unions less than individuals, if it thinks there's a good reason to allow them to give a candidate more, one would think that the state could say, we believe it's appropriate to have a higher limit for corporations and unions because... and have something at the end of that sentence. But there was nothing in the state's argument along those lines. The state still, even in this argument, has not... they haven't presented the scantest explanation of why the state believes that difference in treatment is appropriate. And the state argues as though plaintiffs can't challenge the state giving somebody else a higher limit. Well, the problem isn't so much the higher limit for somebody else, but on the lower limit on yourself when others are treated better. It's not fair that somebody else can give more than me, is the complaint. And the state has to justify that because, again, the state can't play favorites among donors. And if you could never challenge the state's more favorable treatment of somebody else, there'd never be a way for a plaintiff to stop the state from doing this sort of scheme, to setting up a scheme to favor certain people over others. Mr. Hubert, would you agree that the burden that you say the Supreme Court puts on the state to justify these limits is something of a sliding scale depending on novelty, precedent, the extent of discrepancies? In terms of the evidence the state has to present, yes, the Supreme Court made that clear in Nixon. The more novel the scheme, the more the state has to do to come forward and justify what it's done. And also, if plaintiffs present evidence, that may further add to the state's burden to justify what it's done. The state argues that Dr. Osborne's testimony was fatally flawed because he didn't look at data, but they tried to exclude his testimony on that basis before he testified. And Dr. Osborne explained, well, I used a qualitative method, and that's an appropriate method for people in my field. It doesn't rely on data. This is a bench trial, and admission doesn't necessarily mean it has to be credited, right? That's true. But there was nothing in the record to suggest that Dr. Osborne didn't apply the methods from his field, that what he was testifying to didn't reflect what the academic literature said and what he had learned in his experience. Nothing at trial undermined that basis for his testimony. And given that, it's not clear what basis for rejecting his testimony there could be other than the district court simply not thinking it's the case that his conclusions could be correct. On the question of whether legislative leaders can be replaced, that's true, but it's not as simple as it might be in an ordinary party committee because the leader has a lot of power over the members of his or her caucus. And if somebody tries to challenge the leader and... So do a lot of state chairs. Well, in this state in particular, perhaps, but it's not as inherent as in the legislative caucus committee where a leader is always going to have institutional power over the members of the committee where if they unsuccessfully challenge the leader, they can be thrown off committees, they can be denied good positions, they can have their legislation not called, and they can have their primary source of funding cut off. And another key characteristic here is candidates can only take money from one legislative caucus committee. So if the leader gives you money, you can't then turn to another caucus committee later. You're bound to that particular leader. And that's something that other political parties don't have, and it seems to be inexplicable unless the purpose of these legislative caucus committees is to get candidates to be more committed to the leader, to be more bound to do the leader's bidding, lest they risk losing one of their most important sources of funding. More committed to the leader or to the party? Well, to the leader because the leader controls this committee. As long as he or she has a majority of the caucus. But again, they have institutional mechanisms of keeping themselves in power that are not present in other types of committees. My time is up. All right, thank you. Our thanks to both counsel. The case is taken under advisement.